IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA,

Plaintiff,

v.

BROOK VILLAGE ASSOCIATES
LIMITED PARTNERSHIP, ET AL.

Defendants.

CIVIL ACTION NO. 05-195S

**UNITED STATES' MOTION TO ENTER CONSENT DECREES**

The United States of America, by the authority of the Attorney General and on behalf of the United States Environmental Protection ("EPA") and the Department of the Interior ("DOI"), by this motion seeks entry of the Consent Decrees previously lodged in this action on May 6, 2005. In support of this motion, the United States states as follows:

1. On May 6, 2005, the United States lodged two Consent Decrees: one between the United States and the State of Rhode Island and Defendant Brook Village Associates Limited Partnership and the second Decree between the United States and the State of Rhode Island and Centerdale Manor Associates. The Consent Decrees, entered into pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9601, et seq., provided for the reimbursement of certain costs that the United States and the State have incurred and will incur and natural resource damages in connection with the release or threatened release of hazardous

substances at or from a site known as the Centredale[1] Manor Restoration Project Superfund Site located in North Providence, Rhode Island ("the Site"). Through the Decrees, the Settling Parties will pay over $3.5 million in the aggregate.[2]

2. The United States simultaneously filed a Complaint against Brook Village and Centerdale Manor under Section 107 of CERCLA.

3. Centerdale Manor and Brook Village own and operate subsidized senior citizen housing projects on the Site, having come to the Site after various businesses disposed of hazardous substances at the Site. Centerdale Manor and Brook Village provide subsidized housing to about 240 senior citizens. Among other things, the Consent Decrees require Centerdale Manor and Brook Village to continue to operate as subsidized senior citizen housing projects.

4. The settlements with Brook Village and Centerdale Manor are based on the limited ability to pay of these parties as determined by a qualified financial analyst hired by EPA and based on the analysis provided by Rhode Island Housing and Mortgage Finance Corporation. See Declarations of Joan Meyer, of Industrial Economics, Inc., and Carol Ventura, Director of Development for Rhode Island Housing and Mortgage Finance Corporation, attached to EPA's Responsiveness Summary as Appendices 2 and 3. EPA's Responsiveness Summary is attached hereto.

---

[1] The spelling of the Superfund Site and the Defendant is slightly different. The Superfund Site is spelled "Centredale" and the Defendant's name is spelled "Centerdale."

[2] In addition to the $3.5 million which the Settling Parties are paying through taking out loans, the Governments will received an additional $360,000 through insurance settlements achieved by Brook Village. Accordingly, the Settling Parties will be paying approximately $3.9 million through the settlements.

5. After the United States lodged the Consent Decrees, the United States published notice of the lodging in the Federal Register, thereby commencing a 30-day public comment period. 70 Fed. Reg. 30483 ( May 26, 2005).

6. The United States received 26 pages of comments from four separate entities and the State of Rhode Island received one set of comments two pages in length (hereafter referred to as "the Comments"). EPA prepared a Responsiveness Summary which discusses the Comments and provides EPA's explanation as to why the Comments do not require rejection of the Decrees. The Responsiveness Summary, together with the Meyer and Ventura Declarations that are appended thereto, are attached hereto. Indeed, the Responsiveness Summary, together with the United States Memorandum in Support of its Motion, demonstrate that the settlements extract all available equity from both Settling Parties and, therefore, the settlements are fair, reasonable and in the public interest and should be approved by this Court.

THEREFORE, the United States respectfully moves this Court to grant the United States' Motion and enter the Consent Decrees lodged with the Court on May 6, 2005 as a judgment by signing the signature lines for the Court at page 22 of the Decrees. In support of this Motion, the United States relies upon the Memorandum of Law submitted herewith, and the Responsiveness Summary and the exhibits thereto, attached hereto.

Respectfully Submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environmental and Natural Resources
Division
U.S. Department of Justice
Washington, D.C. 20530

HENRY S. FRIEDMAN
Senior Attorney
Environmental Enforcement Section
Environmental and Natural Resources
Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611

ROBERT CLARK CORRENTE
United States Attorney

By:

LUIS MATOS
Assistant United States Attorney
District of Rhode Island
Fleet Center, 50 Kennedy Plaza, 8th Floor,
Providence, Rhode Island 02903

OF COUNSEL:

EVE VAUDO
Enforcement Counsel
U.S. Environmental Protection Agency
New England Region
One Congress St.
Suite 1100 (SES)
Boston, Ma. 02114-2023

CERTIFICATE OF SERVICE

I, Henry S. Friedman, hereby certify that copies of the United States of America's Motion to Enter Consent Decrees, together with the exhibits attached thereto, and Memorandum in Support thereof were served on February 7, 2006 by first class mail, postage prepaid, and by electronic mail, as follows:

Laurie Burt, Esq.
Foley Hoag
Seaport World Trade Center
155 Seaport Blvd.
Boston, Ma. 02210-2600
lburt@foleyhoag.com

Richard J. Welch
Moses & Afonso
170 Westminster Street, Suite 201
Providence, R.I. 02903
rwelch@mosesafonso.com

William S. Eggeling
Ropes & Gray LLP
30 Kennedy Plaza
Providence, R.I. 02903
William.Eggeling@ropesgray.com

Howard J. Castleman, Esq.
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111
Hcastleman@brownrudnick.com

Michael Milito, Esq.
Rhode Island Housing and Mortgage Finance Corporation
44 Washington St.
Providence, RI. 02903
mmilito@rihousing.com

Brian Wagner, Esq.
Rhode Island Department of Environmental Management
235 Promenade Street
Providence, RI. 02908-5767
brian.wagner@dem.ri.gov

Terrence Tierney
Assistant Attorney General
R.I. Department of the Attorney General
150 North Main St.
Providence, R.I. 02903
Ttierney@riag.ri.gov

Jerome C. Muys, Jr.
Swidler Berlin
The Washington Harbour
3000 K. Street, N.W., Suite 300
Washington, D.C. 20007-5116
jcmuys@swidlaw.com

James P. Ray
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
jray@rc.com

HENRY S. FRIEDMAN
Senior Attorney
Environmental Enforcement Section
Environmental and Natural Resources
Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>BROOK VILLAGE ASSOCIATES LIMITED PARTNERSHIP, ET AL.<br><br>Defendants. | CIVIL ACTION NO. 05-195S |

**UNITED STATES' MEMORANDUM IN SUPPORT OF ITS MOTION TO ENTER CONSENT DECREE**

The United States of America, by the authority of the Attorney General and on behalf of the United States Environmental Protection ("EPA") and the Department of the Interior ("DOI"), moves for the entry of two Consent Decrees which were lodged with the Court, for the reasons set forth below.

## I. PRELIMINARY STATEMENT

A. Procedural History

On May 6, 2005, the United States lodged two Consent Decrees: one between the United States and the State of Rhode Island and Defendant Brook Village Associates Limited Partnership and the second Decree between the United States and the State of Rhode Island and Centerdale Manor Associates.[1] The Consent Decrees, entered into pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended

[1] The spelling of the Superfund Site and the Defendant is slightly different. The Superfund Site is spelled "Centredale" and the Defendant's name is spelled "Centerdale."

("CERCLA"), 42 U.S.C. § 9601, et seq., provided for the reimbursement of certain costs that the United States and the State have incurred and will incur and natural resource damages in connection with the release or threatened release of hazardous substances at or from a site known as the Centredale Manor Restoration Project Superfund Site located south of Route 44 on the eastern bank of the Woonasquatucket River, in North Providence, Rhode Island ("the Site"). Centerdale Manor and Brook Village own and operate subsidized senior citizen housing projects on the Site, both having developed at the Site after various other entities disposed of hazardous substances at the Site. The settlements with Brook Village and Centerdale Manor are based on the limited ability to pay of these parties as determined by a qualified financial analyst hired by EPA and based on the financial analysis performed by Rhode Island Housing and Mortgage Finance Corporation ("Rhode Island Housing"). In addition, these settlements are based upon public interest considerations in that the Settling Parties came to the Site after all industrial activity had ceased and are operators of subsidized low-income housing for the elderly. Through the settlements, the Settling Parties will be paying over $3.5 million in aggregate, plus an additional approximately $360,000 through Brook Village's settlements with its insurance carriers. The United States simultaneously filed a Complaint against Brook Village and Centerdale Manor under Section 107 of CERCLA. On or about May 11, 2005, the State filed a Complaint against the Defendants and also a Motion to Consolidate. On May 27, 2005, the Court entered an Order granting the State's Motion to Consolidate. On or about December 12, 2005, the United States filed a Motion for an Enlargement of Page Limits with respect to the exhibits and memorandum of law that it would submit in support of its Motion to Enter the Consent Decrees. On December 14, 2005, the Court granted this Motion.

After the United States lodged the Consent Decrees, the United States published notice of the lodging in the Federal Register, thereby commencing a 30-day public comment period. 70 Fed. Reg. 30483 ( May 26, 2005). As will be described in more detail below, the United States received comments from four separate entities and the State of Rhode Island received one comment. It is the United States' position that none of the comments provide a basis for rejecting the Consent Decrees and the Decrees are fair, reasonable and in the public interest and, therefore, the Court should grant the United States' Motion and approve the settlements.

The Site

The Site covers approximately 9 acres located at 2072 and 2074 Smith Street, North Providence, Rhode Island. The Woonasquatucket River borders the Site and the floodplain of the River is within the Site. (Complaint, ¶ 6).

Atlantic Chemical Company, a chemical manufacturer, began operating on a portion of the Site in approximately 1940. After a series of name changes, the company ceased operations in the early 1970s. New England Container Company ("NECC") operated a drum reconditioning facility on a portion of the Site from approximately 1952 to 1971. A fire in the early 1970s destroyed most of the structures at the Site. (Complaint, ¶ 7).

In October 1976, Brook Village purchased a 3.5 acre parcel on the Site on which the chemical company had previously operated. Brook Village started construction of an apartment building in 1976 and completed construction in 1977. Brook Village is the current owner of a Section 8 affordable housing apartment building for 113 elderly residents and has provided affordable housing for more than 100 elderly residents since 1977. (Complaint, ¶ 8). In March 1982, Centerdale Manor purchased a 5.4 acre parcel on the Site on which the barrel company had

previously operated. Centerdale Manor started construction of an apartment building in 1982 and completed construction in 1983. Centerdale Manor is the current owner of a Section 8 affordable housing apartment building for 129 residents and has provided affordable housing for about 130 elderly residents since 1983. (Complaint, ¶ 9).

In 1996, EPA discovered hazardous substances including polychlorinated biphenyls, mercury, antimony, arsenic, chromium, lead, manganese and dioxin in soil, wetlands and flood plain samples at the Site. (Complaint, ¶ 10). Beginning in January 1999, EPA initiated a series of removal actions which included sampling the Site, and placing temporary and permanent fencing around contaminated surface soil. (Complaint, ¶ 11).

Beginning in 1999, EPA sent general notice letters to Brook Village and Centerdale Manor and three other Potentially Responsible Parties ("PRPs"). EPA requested that all five PRPs voluntarily perform or finance time-critical removal activities at the Site. On April 12, 2000, EPA issued a Unilateral Administrative Order to five PRPs (including Brook Village and Centerdale Manor), ordering the parties to complete time-critical removal activities at the Site comprised of the completion of the second interim soil cap and implementation of certain flood control measures. All five PRPs complied with the UAO. EPA approved the PRPs' Completion of Work Report on September 11, 2000. (Complaint, ¶ 12).

In July 1999, EPA began a remedial investigation/feasability study ("RI/FS") for the Site. EPA issued the draft Remedial Investigation report in the Summer 2005, and EPA is in the process of preparing the Feasibility Study, a draft of which is expected in the Spring, 2006. EPA expects to issue the Record of Decision in 2007 through which EPA will select a remedial action to address the release or threatened release of hazardous substances at or from the Site.

(Complaint, ¶ 13). In March 2001, the Site was placed on the National Priorities List ("NPL"), 40 C.F.R. Part 300, Appendix B, pursuant to Section 105(a) of CERCLA, 42 U.S.C. § 9605(a). Sites on the NPL are those that EPA has determined present the greatest danger to public health, welfare, or the environment, and are eligible for long-term remedial action financed with funds from the Hazardous Substance Superfund, commonly referred to as the "Superfund", 42 U.S.C. § 9611. (Complaint, ¶ 15).

On March 26, 2001, EPA issued a second Unilateral Administrative Order to Brook Village and Centerdale Manor and three other PRPs ordering these parties to perform the work set forth in an Engineering Evaluation and Cost Analysis report. EPA certified this work as complete by letter dated May 13, 2005. In September 2003, EPA issued an Administrative Order on Consent ("AOC") requiring Brook Village, Centerdale Manor and three other PRPs, plus five additional PRPs, to perform a second time-critical removal action consisting generally of the reconstruction of the tailrace[2], including control of storm drain runoff and sedimentation entering the tailrace, and construction and maintenance of a protective cap over the tailrace area. In October 2003, EPA issued a unilateral administrative order to two PRPs that declined to sign the September 2003 AOC and ordered these parties to participate and cooperate with the respondents to the AOC. (Complaint, ¶¶ 15 - 17).

The Settling Parties have advised EPA that they have already spent more than $1 million each in contractor, consultant and attorneys fees responding to the contamination at the Site. See EPA's Responsiveness Summary, pp. 12, 16, attached to United States' Motion as Exhibit 1.

---

[2] A tailrace is a channel used for floating away milling or mining refuse.

B. The Consent Decrees

The Brook Village Consent Decree requires Brook Village to pay a total of $1,451,936[3] as follows: $1,197,781.12 to EPA, which will be placed in a Superfund special account and will be available to fund future clean up of the Site; $68,450 to the Department of the Interior ("DOI") for natural resource damages and assessment costs; $150,000 to an escrow account (administered by Brook Village) to cover Brook Village's ongoing obligations under previous enforcement orders; $104,154.88 to the State; and 75% of any future insurance recoveries to EPA. (Brook Village Consent Decree, ¶¶ 5, 6, 10 , 11). The Centerdale Manor Consent Decree requires Centerdale Manor to pay $2,311,364 as follows: $1,988,454.88 to EPA, which will be placed in a Superfund special account and will be available to fund future clean up of the Site; $68,450 to DOI for natural resource damages and assessment costs; $150,000 to an escrow account (administered by Centerdale Manor) to cover Centerdale Manor's ongoing obligations under previous enforcement orders; $172,909.12 to the State; and 100% of any future insurance recoveries to EPA. (Centerdale Manor Consent Decree, ¶¶ 5, 6, 10 , 11).[4] The Consent Decrees require Centerdale Manor and Brook Village to use their properties as "affordable assisted living" facilities for 40 years. Consent Decrees, ¶¶ 26 and 33.

Each Settling Party is obtaining its settlement payment by taking a new mortgage against

---

[3] In addition, the Brook Village Consent Decree provides that the United States shall receive 75% of the net insurance proceeds that Brook Village recovers from its insurance carriers. The United States expects to receive approximately $360,000 on account of these insurance recoveries.

[4] Paragraph 5 of the Decrees provide that the payments to EPA and the State will change depending on when the refinancing transactions close and that the payments will be adjusted to reflect the maximum equity available consistent with federal and state requirements and the prevailing interest rate.

the property it owns which mortgage is being provided by Rhode Island Housing. Rhode Island Housing will sells bonds and from the proceeds will make loans to the Defendants. See Ventura Declaration, ¶ 20.[5]

The Consent Decrees provide that the settlements are appropriate because the Settling Parties have a limited ability to pay EPA's past and future response costs and Natural Resource Damages and that the Consent Decrees require Defendants to pay the maximum they are able, while still continuing to provide affordable housing at the Site.

C. The Comments and EPA's Responses

The United States received four sets of comments during the public comment period. (A copy of each set of comments is attached to EPA's Responsiveness Summary as Appendix 1; EPA's Responsiveness Summary is attached to the United States' Motion as Exhibit 1). The United States received comments from New England Container Company, which previously operated a barrel refurbishing operation at the Site, and from Emhart Industries, an alleged successor to the chemical company that previously operated at the Site, criticizing the settlements on a number of grounds, but largely because the Settling Parties are not paying enough, and requesting that the Court not approve the Decrees. The United States received a third, very brief comment from B. Sachau, who appears to live in New Jersey, and to EPA's knowledge has no connection to the Site, stating that the United States should have received a larger settlement.

---

[5] Rhode Island Housing is a public corporation of the State of Rhode Island, created pursuant to the Rhode Island Housing and Mortgage Finance Corporation Act, Chapter 55 of Title 42 of the General Laws of Rhode Island. Rhode Island Housing is a self-supporting organization. It receives no State funding for operations; instead, it funds its operations by earning a spread on the money it lends and the fees that its charges for its work. Rhode Island Housing is the State's principal housing agency, and its mission is to assist Rhode Islanders who, by reason of income, special need or circumstance, are unable to fairly obtain and sustain a healthy, affordable home. See Declaration of Carol Ventura of the Rhode Island Housing and Mortgage Finance Corporation, ¶ ¶ 4-6, attached to EPA's Responsiveness Summary, which in turn is appended to the United States' Motion.

The United States received a fourth comment from Senator Lincoln Chafee and Representatives Patrick Kennedy and James Langevin, which supports the settlement and commends the parties for reaching a resolution of this matter.

Consistent with Agency practice, EPA prepared a Responsiveness Summary in which EPA discussed the comments and explained why the comments do not provide a basis for rejection of the Decrees. EPA's Responsiveness Summary establishes that each Settling Party, operators of low-income, senior citizen housing, has a limited ability to pay and each are paying the maximum they are able. The comments and EPA's responses are discussed at length, infra, as well as in EPA's Responsiveness Summary. For the reasons discussed below, the United States respectfully submits that this Court should approve the Consent Decrees.

## II. ARGUMENT

## THE CONSENT DECREES SHOULD BE APPROVED

### A. Statutory Framework

CERCLA was originally enacted to insure that hazardous waste sites around the country would be cleaned up promptly and that those responsible for the contamination would pay the costs of the cleanup. See S. Rep. No. 96-848, at 13 (1980); Dedham Water Co. v. Cumberland Farms Dairy, Inc., 805 F.2d 1074, 1081 (1st Cir. 1986). CERCLA provides the United States government with a powerful array of tools for effectuating its statutory purposes. Section 104(a) of the Act, 42 U.S.C. § 9604(a), authorizes the government to immediately respond to releases or threatened releases of hazardous substances into the environment. Alternatively, whenever there may be an imminent and substantial endangerment to the public health, welfare, or the environment, Section 106(a) authorizes EPA to compel, by means of an administrative order or a

request for judicial relief, the responsible parties to undertake response actions, which the government then monitors. See 42 U.S.C. § 9606(a).

The Act also created a Hazardous Substance Response Trust Fund, known as the Superfund, to provide money up front to finance federal response actions undertaken pursuant to Section 104(a) of CERCLA. 42 U.S.C. § 9604(a). The Superfund also finances federal response actions "where a liable party does not clean up, cannot be found, or cannot pay the costs of cleanup and compensation." S. Rep. No. 96-848, at 13 (1980).

However, in enacting CERCLA, Congress wanted to ensure that:

> society should not bear the costs of protecting the public from hazards produced in the past by a generator, transporter, consumer, or dumpsite owner or operator who has profited or otherwise benefitted from commerce involving these substances and now wishes to be insulated from any continuing responsibilities for the present hazards to society that have been created.

S. Rep. No. 96-848, at 98 (1980). For this reason, and because the Superfund is so limited in view of the magnitude of the nation's hazardous waste problem, CERCLA provides that monies spent by federal and state governments to clean up hazardous waste will, whenever possible, be recovered from "responsible parties" through the liability scheme provided for in Section Section 107(a)(4)(A). In addition, Congress authorized in the Superfund Amendments and Reauthorization Act of 1986 ("SARA") several types of settlements that EPA may utilize in CERCLA actions, including consent decrees providing for PRPs to contribute to cleanup costs or to undertake response activities themselves. See 42 U.S.C. § 9622. Congress expressed a strong preference that the United States settle with responsible parties under CERCLA in order to avoid spending resources on litigation rather than on cleanup. H.R. Rep. No. 99-253, pt. 1, at 80

(1985), reprinted in 1986 U.S.C.C.A.N. 2835. As the court noted in United States v. Charter Int'l Oil Co., 83 F.3d 510, 520 (1st Cir. 1996), "[p]erhaps mindful of the huge resources going into the transactions costs of CERCLA litigation, rather than to remediating the sites, Congress sought in SARA to encourage earlier resolutions by agreement." These settlements serve to "reduce excessive litigation expenses and transaction costs, thereby preserving scarce resources for CERCLA's real goal: the expeditious cleanup of hazardous waste sites." United States v. DiBiase, 45 F.3d 541, 546 (1st Cir. 1995).

Congress has specifically recognized ability to pay as a factor that is appropriately considered in CERCLA settlements. See 42 U.S.C. § 9622(e)(3)(A), (f)(6)(B), (g)(7). In EPA's "General Policy on Superfund Ability to Pay Determinations," Sept. 30, 1997 ("ATP Guidance"), EPA stated that the ability to pay settlement policy is reserved for entities who demonstrate that "payment of the amount sought by the government is likely to put a company out of business or jeopardize its viability. . . ." and also that EPA "must consider the impacts of any settlement on the business or individual that recognizes the value of permitting a functioning business to continue as a productive component of our economy. . . ." ATP Guidance at 1 - 2. Moreover, Section 122(g)(7) of CERCLA was enacted in January 2002 as part of the Small Business Liability Relief and Brownfields Revitalization Act[6] amendments to CERCLA and authorizes settlements with "de minimis" parties "based on a limited ability to pay" and states that "the President shall take into consideration the ability of a person to pay response costs and still

[6] Public Law 107-118.

maintain its basic business operations . . . ." EPA has stated in its "Interim Guidance on the Ability to Pay and De Minimis Revisions to CERCLA § 122(g) by the Small Business Liability Relief and Brownfields Revitalization Act," (May 17, 2004) ("Interim Guidance on the Ability to Pay") that: "To the extent practicable and consistent with the public interest, EPA will apply the same guidelines to all ATP parties, de minimis and non-de minimis."

"Ability to pay" settlements are appropriate because they serve to reimburse the Superfund without imposing undue financial hardship on a settlor:

> While certain PRPs have deep pockets and can afford to shoulder their full share of liability for a site's cleanup, other PRPs simply do not have the resources to pay their share . . . . When negotiating with PRPs who are small businesses or individuals of modest means, the Government seeks to avoid settlements that will force the businesses and individuals into bankruptcy or require them to sell off major assets. Instead, the Government requires such PRPs to pay an amount that will allow businesses to continue operating and will not jeopardize the modest lifestyles of individual parties. In this fashion, the Government will recover some of its past costs while the PRPs are spared financial ruin . . . .

United States v. Bay Area Battery, 895 F.Supp. 1524, 1529-30 (N.D. Fla. 1995). See also In re Cuyahoga Equip. Corp., 980 F.2d 110, 119 (2d Cir. 1992); United States v. Vertac Chem. Corp., 756 F. Supp. 1215, 1218-19 (E.D. Ark. 1991), aff'd sub nom. United States v. Hercules, Inc., 961 F.2d 796 (8th Cir. 1992).

B. Standard of Judicial Review of the Consent Decree

Approval of a consent decree is a judicial act committed to the informed discretion of the trial court. United States v. Cannons Eng'g Corp., 720 F. Supp. 1027, 1035 (D. Mass. 1989), aff'd, 899 F.2d 79 (1st Cir. 1990). Generally, when reviewing a settlement, the standard to be

applied is whether the settlement is "fair, adequate, and reasonable." Walsh v. Great Atlantic & Pacific Tea Co., 726 F.2d 956, 965 (3rd Cir. 1983).

This standard has been affirmed for the review of CERCLA settlements. United States v. Cannons Eng'g Corp., 899 F.2d 79, 85 (1st Cir. 1990) (the court should enter a CERCLA consent decree if the decree "is reasonable, fair, and consistent with the purposes that CERCLA is intended to serve" quoting the House Report on the Superfund Amendments and Reauthorization Act of 1986, H.R. Rep. No. 99-253, Part 3 at 19 (1985), reprinted in 1986 U.S.C.C.A.N. 3038, 3042); United States v. DiBiase, 45 F.3d at 543; United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1084-85 (1st Cir. 1994).

Judicial review of a settlement negotiated by the United States is subject to special deference. As the First Circuit recently stated:

> Considerable deference is involved in the review of CERCLA consent decrees. . . . [T]here is deference to the administrative agency's construction of the settlement. "That so many affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's length and advocate its embodiment in a judicial decree, itself deserves weight in the ensuing balance."

United States v. Davis, 261 F.3d 1, 21 (1st Cir. 2001) (citations omitted); United States v. Cannons Eng'g Corp., 899 F.2d at 84 (the court should not engage in "second-guessing the Executive Branch"). Furthermore, the reviewing court may approve or reject the proposed Consent Decree, but the court does not have the authority to modify the proposed Decree. United States v. Cannons Eng'g Corp., 720 F.Supp. at 1036. As the First Circuit states, "[t]he relevant standard, after all, is not whether the settlement is one which the court itself might have

fashioned, or considers as ideal. . . ." United States v. Cannons Eng'g Corp., 899 F.2d at 84. "If a settlement were required to meet some judicially imposed platonic ideal, then, of course, the settlement would constitute not a compromise by the parties but judicial fiat. Respect for litigants, especially the United States, requires the court to play a much more constrained role." United States v. Rohm & Haas Co., 721 F. Supp. 666, 685 (D.N.J. 1989). See also United States v. Charles George, 34 F.3d at 1085 (Court "must defer heavily to the parties' agreement and the EPA's expertise").

Accordingly, the Court's role in this process is limited and the Court should not substitute its judgment for that of the parties. Because the proposed settlements are fair, reasonable, consistent with the goals of CERCLA and in the public interest, this Court should enter the Consent Decrees.

C. The Consent Decrees should be approved by the Court

1. The Consent Decrees Are Fair

As discussed above, the first element courts consider when reviewing a consent decree is whether the settlement is fair. Fairness of a CERCLA settlement involves both procedural fairness and substantive fairness. United States v. Davis, 261 F.3d at 23; Cannons, 720 F. Supp. at 1039. Courts evaluate procedural fairness by considering the openness and candor of the bargaining process. Davis 261 F.3d at 23, quoting Cannons, 899 F.2d at 86. In Rohm & Haas, the court found that:

> where a settlement is the product of informed, arms-length bargaining by the EPA,

> an agency with the technical expertise and the statutory mandate to enforce the nation's environmental protection laws, in conjunction with the Department of Justice . . . a presumption of validity attaches to that agreement.

721 F. Supp. at 681 (emphasis added) (citing City of New York v. Exxon Corp., 697 F. Supp. 677, 692 (S.D.N.Y. 1988)); DiBiase, 45 F.3d at 544-46; Charles George, 34 F.3d at 1089.

Here, the Consent Decrees are procedurally fair. The "procedural integrity" required of the government is to have "conducted negotiations forthrightly and in good faith." Cannons, 899 F.2d at 86. The parties devoted more than a year negotiating fair and reasonable settlements, during which time the Settling Parties and the United States had adverse interests and vigorously discussed the facts of the case, the parties' legal positions and ultimately the settlement terms. The Settling Parties were represented by experienced counsel and the United States was represented by experienced counsel at the Department of Justice, EPA and DOI. All negotiations were conducted at arms-length, and in good faith. Accordingly, the Consent Decrees are procedurally fair.

Moreover, the Decrees are substantively fair. As the First Circuit stated in Cannons "[s]ubstantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." 899 F.2d at 87. See also Davis 261 F.3d at 23 ("A finding of procedural fairness may also be an acceptable proxy for substantive fairness, when other circumstantial indicia of fairness are present." ); United States v. Charles George, 34 F.3d at 1087-89. In reviewing substantive fairness, the court need only determine whether a proposed consent decree reflects a reasonable compromise of the litigation. Rohm & Haas, 721 F. Supp. at 685. Factors considered by courts reviewing CERCLA consent decrees for fairness include "'the strength of the plaintiffs' case, the

good faith efforts of the negotiators, the opinions of counsel, and the possible risks involved in the litigation if the settlement is not approved.'" Kelley v. Thomas Solvent Co., 717 F. Supp. 507, 517 (W.D. Mich. 1989) (citing United States v. Hooker Chem. & Plastic Corp., 607 F. Supp. 1052, 1057 (W.D.N.Y.), aff'd, 776 F.2d 410 (2d Cir. 1985)). The terms of the settlements demonstrate the substantive fairness of the Decrees in this case. As discussed below, the Decrees are substantively fair because the Decrees require the Settling Parties to pay the maximum amounts they are able to pay. In addition, the United States' claims could be affected by significant risks, if these claims were pursued through trial on the merits.

2. The Consent Decrees are Reasonable.

Whether or not a decree is "reasonable" for purposes of judicial review of CERCLA settlements primarily involves the technical effectiveness of clean-up requirements in decrees obligating settlors to perform remediation. In Nicolet, Judge Broderick, adopting the test from United States v. Conservation Chem. Co., 628 F. Supp. 391, 402 (W.D. Mo. 1985), reviewed several factors pertinent to reasonableness but determined that only two applied to a monetary settlement such as this one: whether the decree furthered the goals of the statute that forms the basis of the litigation; and the extent to which the court's approval of the decree was in the public interest. United States v. Nicolet, Civ. A. No. 85-3060, 1989 WL 95555 at *5; 30 Env't Rep. Cas. (BNA) 2061, 2066 (E.D. Pa. Aug. 15, 1985). Those factors obviously overlap with the other criteria of fairness and consistency with CERCLA.

In this case, the settlement provides reasonable monetary recovery because it "functions exactly as the CERCLA cost recovery action was intended." Kelley v. Thomas Solvent, 717 F. Supp. at 518 (settlement for over $4.7 million dollars was upheld by the court and made

available, two-thirds of it immediately, for use by the Superfund, implementing the cost recovery scheme of CERCLA by replenishing the Superfund promptly). Here, each Decree returns a substantial amount of money. Requiring a payment of over $2.3 million by Centerdale Manor and over $1.4 million by Brook Village -- which is all the equity in their housing projects -- furthers the public interest that the statute sought to address, and ensures that monies obtained will be used at the Site for cleanup.[7] In addition, the settlements further other public interest concerns by requiring that the housing projects continue to operate as low-income subsidized housing, preserving low-income housing stock in Rhode Island and thereby preventing the displacement of several hundred elderly residents. Thus, the settlements are reasonable.

The final component of reasonableness is an evaluation of the relative strength of the parties' litigating positions, Davis, 261 F.3d at 26. Accordingly, these settlements also take into account litigation risk. This is not only permissible, it is a universally recognized basis for settlement. United States v. Cannons Eng'g Corp., 899 F.2d at 90 ("the reasonableness of a proposed settlement must take into account foreseeable risks of loss"); In re Acushnet River & New Bedford Harbor, 712 F. Supp. 1019, 1036 (D. Mass. 1989) ("An interpretation of [CERCLA] more in keeping with the intent of, as well as the language employed by, Congress is one that requires the United States to assess the strengths and weaknesses of its case and drive the hardest bargain that it can.").

In this case, Brook Village asserts that it is an innocent landowner under Section 101(35) of CERCLA and has filed a petition, pursuant to Section 106(b) of CERCLA, to recover all the

[7] The proceeds that EPA will receive in settlement will be paid into a special account set up for the Centredale Manor Superfund Site and will be used to finance the cleanup of the Site. Consent Decrees, ¶ 7.

costs that it has expended cleaning up the Site pursuant to EPA's second unilateral administrative order. If successful, Brook Village would receive reimbursement of up to the $575,000 it sought in its petition, plus interest and EPA would likely be foreclosed from seeking any other contribution from Brook Village. Having acquired the property after all industrial activity on the property had ceased, Brook Village may be in a position to satisfy some of the prerequisites of the innocent landowner defense.

While the United States believes its position on the innocent landowner defense would be upheld, the United States faces litigation risks, and the settlement reflected in the Consent Decree properly reflects the uncertainties inherent in litigation. Accordingly, the proposed Consent Decrees are clearly reasonable.

3. The Settlements Are Consistent With CERCLA's Primary Goals and Are in the Public Interest

The Decrees meet the final criterion for settlements because they are consistent with the statutory goals of CERCLA and are in the public interest. CERCLA authorizes the clean-up of hazardous waste sites using money from the Superfund, but the Superfund is limited and cannot finance clean-up of all of the many hazardous waste sites across the nation. Congress knew when it enacted CERCLA that the costs of response activities would greatly exceed the Superfund. Kelly v. Thomas Solvent Co., 717 F. Supp. at 518 (and citations therein). Settlements of CERCLA cases in which the defendants agree to reimburse the United States for response costs are in the public interest, while the covenant not to sue provides protection to settling defendants and an end to litigation. Recovery of costs expended from the public fisc is entirely consistent with this underlying principle of CERCLA and is undeniably in the public

interest.

Cost effective settlement practices also further the public interest and public health and safety by preserving precious resources of the government in its efforts to implement effective remedies at hazardous waste sites as quickly as possible. See Kelley v. Thomas Solvent Co., 717 F. Supp. at 518.

D. The Public Comments Provide No Basis To Deny Entry Of The Consent Decrees

Comments by Emhart Industries and New England Container

Emhart and New England Container object to the proposed Decrees on a number of grounds. These comments and a summary of EPA's responses are set forth below.[8] As is demonstrated below and in EPA's Responsiveness Summary, none of the comments provide a basis for rejecting the proposed settlements.

**Comment No. 1:** New England Container and Emhart object to the proposed Consent Decrees on the ground that they and other PRPs were not consulted or included in the negotiations. See NEC Comment at 2, 9; Emhart Comment at 6.

**EPA's Response to Comment No. 1**: EPA is not obligated to consult with other PRPs while it negotiates a settlement. CERCLA provides for a public comment period on certain proposed settlements and requires EPA to consider and respond to all comments received during that period.[9] The fact that the non-settling Potentially Responsible Parties and the public were not privy to the back-and-forth of these negotiations does not bear on the procedural fairness of the proposed Consent Decree, as "[t]he confidentiality of the negotiations does not have any

[8] EPA's complete Responsiveness Summary is attached to the United States Motion as Exhibit 1.

[9] CERCLA §122(d)(2)(B), 42 U.S.C. § 9622(d)(2)(B).

bearing on the 'candor, openness, and bargaining balance' as between the parties to the negotiation . . . ," United States v. Bliss, 133 F.R.D. 559, 569 (E.D. Mo. 1991). Moreover, there is no requirement in the common law or CERCLA that requires the United States to open up negotiations to third parties. Thus, courts do not require that the government's negotiating strategy be "an open book" or put the government under an obligation "to telegraph its settlement offers, divulge its negotiating strategy in advance, or surrender the normal prerogatives of strategic flexibility which any negotiator cherishes." Cannons, 899 F.2d at 93. Likewise, the government retains its prerogative to structure the order and pace of settlement negotiations, so long as it operates in good faith. Id.

In this case in particular, the Settling Parties are not similarly situated to other PRPs – including commenters Emhart and New England Container – in that they were not responsible for the initial operations (manufacture of chemicals and barrel refurbishing) that led to the contamination at the Site. Instead, the Settling Parties operate low-income apartment complexes for the elderly providing significant public benefits, and are positioned to complete refinancing transactions that promise to generate a greater contribution toward cleanup than could otherwise be generated from regular cash flow (as described further in the Response to Comments 4 and 5). For these reasons, the United States properly chose to participate in settlement discussions with the Settling Parties without inviting other PRPs to participate. See EPA's Responsiveness Summary, p. 8, attached to United States' Motion, Exhibit 1.

**Comment No. 2**: New England Container and Emhart object to the proposed Consent Decrees because they were not provided sufficient financial information to evaluate the proposed Consent Decrees during the public comment period. See NEC Comment at 6-7; Emhart

Comment at 1, 4.

**EPA's Response to Comment No.** 2: The financial information with respect to the Settling Parties is contained in the Declarations attached to EPA's Responsiveness Summary which are appended to United States' Motion. See Declarations of Joan Meyer, of Industrial Economics, Inc., and Carol Ventura, Director of Development for Rhode Island Housing and Mortgage Finance Corporation, attached to EPA's Responsiveness Summary as Appendices 2 and 3.[10/] EPA is not required to provide information in advance to non-settling parties and the Commenters do not cite to any such obligation. See EPA's Responsiveness Summary, p. 9.

**Comment No. 3:** New England Container and Emhart assert that the Consent Decrees are premature, because EPA has not yet estimated remedial costs at the Site or assessed the respective fault of the PRPs. See NEC Comment at 2, 7-8, 11-12; Emhart Comment at 3.

**EPA's Response to Comment No. 3:** EPA is not required to calculate remediation costs before settling with PRPs based on their ability to pay or their status as "peripheral parties."[11/] As described further below (in EPA's Response to Comment No. 5), ability to pay and peripheral party settlements can be appropriate in cases where remediation costs and respective fault have not yet been determined.[12/]

---

10/ The United States is providing this financial information with the agreement of the Settling Parties.

11/ As will be described at length below, EPA guidance describes a "peripheral party" as one who for equitable, financial or other reasons is not the primary focus of Superfund enforcement activities at the site. "Guidance on Administrative Response Cost Settlements under Section 122(h) of CERCLA and Administrative Cashout Settlements with Peripheral Parties under Section 122(h) of CERCLA and Attorney General Authority," Sept. 30, 1998, at 8 ("Peripheral Party Guidance"). The Settling Parties fall within EPA's definition of peripheral parties because of their limited ability to pay, both became owners after all disposal had taken place and both supply subsidized housing to senior citizens.

12 See Davis, 261 F.3d at 24 ("data on the total extent of harm and the respective liabilities of various PRPs are often unavailable. Such difficulties will not preclude a court from entering a consent decree.") (citations omitted);

In addition, given the amounts that the Settling Parties are able to pay in light of the total past and future costs that have been and will be incurred at the Site, there was no reason for EPA to wait until it selected a remedy for the Site in order to consummate settlements here. In this case, the Settling Parties will pay less than $4 million in the aggregate and EPA's past costs are already over $14 million. If EPA's selected remedy for the Site requires future response actions at the Site, total past and future costs at the Site will increase. But, in this case, the Settlors can only pay less than $4 million, so knowledge of the amount of any future costs is not relevant to determining whether the current settlements are appropriate. See EPA's Responsiveness Summary, p. 9.

**Comment No. 4:** New England Container and Emhart object to the determination that the Settling Parties are unable to pay more than the amounts prescribed in the proposed Consent Decrees. More specifically, they say that: **(a)** EPA has not required the Settling Parties' to dedicate five years of income to any settlement, as an EPA guidance memorandum recommends; See Emhart Comment at 5. **(b)** the Settling Parties are not on "the verge of bankruptcy," as another EPA guidance memorandum purportedly requires; See NEC Comment at 12; Emhart Comment at 5. **(c)** the refinancing transactions contemplated by the proposed Consent Decrees do not appear to require the Settling Parties to contribute all refinancing proceeds to the cleanup; See Emhart Comment at 2; and **(d)** EPA's analysis of the Settling Parties' ability to pay does not consider the income and assets of the Settling Parties' general partners, the money the Settling Parties would be able to contribute toward settlement if the apartment buildings were converted

---

Cannons, 899 F.2d at 88 ("it would disserve a principal end of the statute -- achievement of prompt settlement and a concomitant head start on response activities -- to leave matters in limbo until more precise information was amassed").

from affordable units into units rented or sold at market rates and whether more funds could be generated as a result of a future redefinition of equity. See NEC Comment at 12; Emhart Comment at 5.

**EPA's Response to Comment No. 4.**

The Analysis by Joan Meyer, Ph.d., supports the Proposed Settlements

As a threshold matter, in making its determination that each Settling Party is paying an appropriate amount, EPA relies upon the analysis performed by Joan Meyer, who holds a Ph.d in Resource and Environmental Economics from Cornell University, and is a principal in Industrial Economics, Inc. Ms. Meyer conducted a detailed analysis of the financial condition of both settlors and examined a variety of information, including audited financial statements and tax returns. In sum, Ms. Meyer concluded that the only means by which the limited partnerships could continue to operate as they have in the past in providing affordable housing for the elderly and still contribute to the response costs is by refinancing their existing debt and contributing the resulting net proceeds to EPA. Ms. Meyer also concluded that:

- each Settling Party is unlikely to be able to pay a significant amount for response costs through excess cash flow;
- Centerdale's and Brook Village have no discretionary assets – assets that could be sold without jeopardizing their ability to continue in business – that could be sold to generate revenue; and
- the proceeds raised by each Settling Party's refinancing will likely generate the maximum contribution each can make after deductions for ordinary and necessary fees associated with the refinancing and funds needed for capital improvements.

Accordingly, Ms. Meyer's conclusions support EPA's determination that each Settling Party is paying the maximum it is able to contribute. See Meyer Declaration, ¶¶ 4-5, 7-8, 12-13

(Appendix 2 to EPA's Responsiveness Summary, which is in turn appended to the United States' Motion to Enter the Consent Decrees).

The Settlement is Consistent with EPA's Guidances

Further, as EPA's Responsiveness Summary clearly explains, EPA's methodology in reviewing the refinancing transactions is consistent with the primary EPA guidance memorandum on ability to pay determinations, the ATP Guidance. See Declaration of Joan Meyer, ¶ 5 & n.1. The ATP Guidance states that an ability to pay determination should "normally" be based on five years of the PRP's available income.[13] In other words, the Guidance suggests that EPA can accept payments from annual available income over a five year period. But the ATP Guidance also says that each PRP's "financial condition is unique," and authorizes departure from the ability-to-pay methodologies described in the Guidance, particularly where the "fact pattern associated with [a PRP's] financial position may require deviation."[14] The Meyer Declaration demonstrates that Centerdale Manor has averaged a negative net annual cash flow over the past five years and Brook Village has averaged a net annual cash flow of $47,741 over the past five years, and in two of the last five years, net annual cash flow has been negative. In 2003, Brook Village's net cash flow was $260,539, due to a loan of $1 million and without this loan, net cash flow would have been negative. Meyer also stated that the amount of cash flow generated by Brook Village over the years was "highly variable" and by Centerdale Manor was "uneven". Meyer Declaration, ¶¶ 7, 12. Based on this information and other related information contained in her declaration, Ms. Meyer concluded that

---

[13] ATP Guidance, at p. 12.

[14] ATP Guidance, at pp. 12, 15

both Settling Parties lack the ability to generate significant cash flow from regular operations to fund future clean ups. Meyer Declaration, ¶¶ 7, 9-10, 12, 14-15. Based on these conclusions, EPA determined that the Settling Parties' uneven and variable cash flow history is a special financial condition justifying EPA's decision to base ability to pay contributions on the Settling Parties' borrowing capacity. EPA Responsiveness Summary, pp. 10-11. It is also the case that basing the settlements on borrowing capacity results in the Settling Parties making a greater contribution toward the cleanup than would be the case if EPA based the settlements on installment payments made through annual cash flow. As described above, EPA has relied on its economic consultant, Joan Meyer, as the ATP Guidance advises.[15/] Therefore, the proposed Consent Decrees are consistent with the ATP Guidance, and do not underestimate the Settling Parties' ability to pay or otherwise "shortchange" the public and the other PRPs.

Another EPA guidance document provides that "[e]arly ATP consideration may be reasonable when a PRP's financial condition makes it unable to contribute significantly to the site, such as when the PRP is already on the verge of bankruptcy or when the PRP's financial capacity is negligible compared to its estimated share of liability."[16/] In their comments, Emhart and New England Container contend that the Settling Parties have not met this standard because they are not, for example, on the verge of bankruptcy. See NEC Comment at 12; Emhart Comment at 5.

However, the United States submits that the Commenters have misconstrued EPA's

---

[15] ATP Guidance, at p. 6 ("the case team should rely on the opinion expressed by a person qualified to conduct a financial analysis").

[16] Interim Guidance on the Ability to Pay , at p. 5.

guidance. The quoted language includes examples of unusual circumstances to justify an ability-to-pay settlement at the very beginning of the cleanup process – i.e., where the PRP is on the verge of bankruptcy or the CERCLA process is at an "early" stage, such as where the PRP seeks ability-to-pay consideration "in response to an information request or notice letter."[17] First, the quoted language is only illustrative. In addition, the entire passage on which the Commenters rely is not apposite because EPA is not at the beginning stages of this Superfund Site. Although EPA has not yet selected a cleanup remedy for the Site, the Superfund process has advanced considerably beyond the initial stages and, therefore, the cleanup here is not at an "early" stage. EPA issued information requests and notice letters years ago, and has also already undertaken significant investigation of PRPs at the Site, sufficient to establish the Settling Parties' status relative to the other PRPs. The Settling Parties have also participated in several prior cleanup actions at the Site and have already spent more than $1 million each in contractor, consultant and attorneys fees responding to the contamination. See EPA Responsiveness Summary, pp. 11-12, 16. Thus, the language upon which the Commenters rely is not apposite in that the present settlements are not taking place at the beginning of the Superfund process.

Even if the standard cited by the Commenters for early settlements was applicable, the Settling Parties satisfy this standard in that their poor cash flow makes them "unable to contribute significantly to the site" on an ongoing basis.[18] Moreover, the quoted language does not purport to encompass all circumstances. Here, the "facts at the site" – the value of resolving Brook Village's and Centerdale Manor's liability now, when they have the opportunity to

---

[17] Id.

[18] Id.

refinance their mortgages and maximize their equity, justifies the current settlements.

Although the proposed Consent Decrees require payment of less than the gross proceeds of the refinancing transactions, EPA firmly disputes that its "'math' simply does not seem to add up," as asserted by Emhart. See Emhart Comment at 2. As described above, the amounts to be paid by the Settling Parties are necessarily net of the total proceeds of the loans. Some of the loan proceeds must be set aside for expenditures such as debt repayment, transaction costs, legal fees, necessary capital improvements, and operating reserves. Ventura Declaration, ¶¶ 21-23. Indeed, many of these expenditures are necessary for the continued viability of the buildings and the housing projects. Further, EPA's financial expert, Joan Meyer has concluded that the refinancing fees that are being paid out of the loan proceeds are "standard fees charged for refinancing transactions of this magnitude." Meyer Declaration, ¶¶ 10, 15. Moreover, the fees that provide support for Rhode Island Housing's continued operations were "minimized" to assist EPA in its cleanup of the property. Ventura Declaration, ¶ 28. EPA worked with representatives of Rhode Island Housing to insure that these "set-asides" were reduced to the greatest extent possible. EPA Responsiveness Summary, pp. 12-13. Accordingly, the settlements enable the United States to receive the maximum practicable payment out of the refinancing proceeds, as verified by the Meyer Declaration.

EPA's Decision Not to Require a Payment by the Individual Partners Was Appropriate

Under the circumstances of this case, EPA believes it is inappropriate to consider the separate income and assets of the Settling Parties' general partners, or require the Settling Parties to convert the apartments from affordable housing units to units rented or sold at market rates. Although a general partner's assets and income might ordinarily be relevant, EPA is not required

to seek payment from individual partners in every case. EPA believes the limited partnerships here present a "fact pattern . . . [that] may require deviation" from the presumptive methodology described in the ATP Guidance.[19] Low-income housing, like the housing on the Site, is commonly owned by limited partnerships like Brook Village and Centerdale Manor. Rhode Island Housing and agencies of its type must make a significant effort to attract investors for these important projects. Here, the limited partnerships purchased their properties after the operations that led to the contamination took place. In addition, Brook Village and Centerdale Manor have already made significant contributions to the cleanup. If EPA were to seek payments from of the general partners' individual assets, in light of the particular facts of this case, EPA would negatively affect Rhode Island Housing's and other similar agencies' ability to attract necessary sponsors. Furthermore, such a position could induce Brook Village and Centerdale Manor to eliminate the low-income housing on this Site, requiring the relocation of approximately 240 elderly residents, to protect the general partners' individual assets. This result would be harmful and contrary to the underlying purpose of the ATP Guidance, which is to show "compassion for individuals and their unique circumstances." [20]

Given the unusual factors at this Site, it is also not in the public interest to require these parties to change the nature of their ventures to satisfy their liability. It would be inappropriate to require Brook Village and Centerdale Manor to sell these buildings or convert these buildings to market rate properties to generate greater revenues, regardless of whether those changes would generate more income. See EPA's Responsiveness Summary, pp. 13-14, attached to United

---

[19] ATP Guidance, at pp. 12, 15.

[20] Id. at 2.

States' Motion, Exhibit 1. As described above, EPA's ATP Guidance recognizes that EPA must consider whether a settlement "is likely to put a company out of business or jeopardize its viability" and also that EPA "recognizes the value of permitting a functioning business to continue as a productive component of our economy." ATP Guidance at 1 - 2. Moreover, Section 122(g)(7) of CERCLA authorizes EPA to enter into ability to pay settlements with de minimis parties and states that "the President shall take into consideration the ability of a person to pay response costs and still maintain its basic business operations . . . ." EPA has stated in its Interim Guidance on the Ability to Pay that: "To the extent practicable and consistent with the public interest, EPA will apply the same guidelines to all ATP parties, de minimis and non-de minimis." Interim Ability to Pay Guidance, at 6. Accordingly, EPA's guidances make clear that ability to pay settlements should not drive a company out of its business, but should allow it to maintain its basic operations. The present settlements are completely consistent with these guidances.

Further, EPA does not believe that more equity could be raised in the future under new mortgage terms, as suggested by New England Container. First, there would be no mortgage whatsoever without the settlements under the current terms (because Rhode Island Housing would not be willing to provide them). Second, even if it did, interest rates and operating costs could continue to rise, thereby reducing the equity in these buildings, rather than increasing it. See EPA's Responsiveness Summary, pp. 14-15, attached to United States' Motion, Exhibit 1.

**Comment No. 5:** New England Container and Emhart assert that the Settling Parties should not qualify for treatment as "peripheral parties" because the Settling Parties have an ability to pay more than the amounts required under the proposed Consent Decrees, and because

they bear potentially significant blame for the contaminated conditions at the Site. See NEC Comment at 2, 11, 18; Emhart Comment at 5-6. New England Container also claims the settlements are improper because they are premised on a desire to maintain affordable public housing for the elderly, which is not one of the goals of CERCLA. See NEC Comment at 2, 10.

**EPA's Response to Comment No. 5:** These comments are incorrect. According to EPA guidance on "peripheral party" settlements, these settlements are generally appropriate with respect to PRPs "who for equitable, financial or other reasons are not the primary focus of Superfund enforcement activities at the site."[21] These settlements are "particularly appropriate" in two categories of cases: (1) settlements based on the PRP's ability to pay; and (2) settlements with PRPs for whom "unresolved CERCLA liability would be an extreme burden and for whom equitable or public interest considerations argue in favor of speedy settlement."[22] In the case of settlements in the second category, the party should pay an "appropriate amount" of the total costs at the site "given the facts and circumstances of the case."[23] The settlements in this case satisfy both categories.

This memorandum has already demonstrated that each Settling Party qualifies for an "ability to pay" settlement and, therefore, fits within one category of the Peripheral Party Guidance. In addition, the settlements are appropriate here because of the "burden" on them and for "equitable or public interest considerations."[24] As discussed above, unresolved CERCLA

---

[21] Peripheral Party Guidance, p. 8 (the complete citation for this guidance is set forth at note 12, supra).

[22] Id.

[23] Id.

[24] Peripheral Party Guidance, p. 8.

liability would impose an "extreme burden"[25] on the limited cash flow generated by these housing projects, and settlement of this liability is necessary to preserve the low-income housing on the Site. Thus, the requirement of the Consent Decrees that requires the preservation of these operations as low-income housing is a compelling "equitable or public interest" reason for EPA to enter into these settlements. Although low-income housing is not itself a goal of CERCLA, settlements can be based in part on "equitable or public interest" considerations that are distinct from CERCLA's environmental goals. See Section 122(a) of CERCLA, 42 U.S.C. § 9622(a) (authorizing settlements in the "public interest"). Both settlements ensure that approximately 240 elderly residents with limited financial resources will not be forced from their homes.

The proposed Consent Decrees also require the Settling Parties to pay an "appropriate amount" of total remediation costs in light of the "facts and circumstances of the case."[26] Although there is not yet an estimate of total remediation costs at the Site, that fact is immaterial because the Settling Parties are contributing all their equity to the settlement. See Ventura Declaration, ¶ 28; Meyer Declaration, ¶¶ 10, 15. They have already helped to undertake three removal actions, and have spent more than $1 million each in responding to the contamination. EPA Responsiveness Summary, pp. 12-16. There is no dispute that the Settling Parties came to the Site after all industrial activity had taken place, but the Commenters have alleged that the Settling Parties exacerbated the existing contamination through construction activities. See NEC Comment at 9; Emhart Comment at 5-6. Even if this statement is factually accurate, the Settling

---

[25] Id.

[26] Peripheral Party Guidance, at p. 8.

Parties' involvement at the Site is markedly different from that of the remaining PRPs. The Settling Parties' contribution to contamination at the Site was incidental to the construction of affordable housing for the elderly whereas the remaining PRPs were responsible for the initial disposal of hazardous substances at the Site. Moreover, EPA believes that these settlements will generate the maximum amount that the Settling Parties can contribute to future cleanup costs.

The settlements also avoids certain litigation risks. Litigation risk is a factor that EPA may consider in determining whether a settlement is appropriate. See cases cited at p. 16, supra. Brook Village asserts that it is an "innocent landowner" under CERCLA Section 107(b), 42 U.S.C. § 9607(b), arguing that it did not know or have to reason to know of the contamination when it purchased its property at the Site. See discussion regarding litigation risk at pp. 16 -17, supra. The Brook Village Consent Decree provides that, after entry of the proposed Consent Decree, Brook Village will withdraw its Section 106(b) Petition which will insure that there is no further litigation with Brook Village on this matter. See EPA's Responsiveness Summary, pp. 15-17, attached to United States' Motion, Exhibit 1.

**Comment No. 6**: Emhart and New England Container object to the Consent Decrees because they claim the refinancing by Rhode Island Housing, and the continued operation of the apartment buildings as affordable housing, could occur whether there is a settlement or not. See NEC Comment at 2, 11; Emhart Comment at 4.

**EPA's Response to Comment No. 6**: Even if the refinancing of the property could have occurred in the absence of a settlement, a settlement based on this refinancing brings about a greater contribution from the Settling Parties than they would have been able to make on an ongoing basis out of excess cash, based upon historic cash flows. Moreover, the refinancing

likely could not take place without these settlements. Rhode Island Housing, the very agency responsible for selling the bonds that provide the settlement proceeds in this case, has stated that it would be unable to refinance the mortgages for these properties without this settlement. Ventura Declaration, ¶ 26. Further, EPA questions whether the Settling Parties would be able to retain their properties as affordable housing (which is a condition of Rhode Island Housing's participation), with the attendant loss of the opportunity to convert the property to potentially more profitable uses, without a settlement of their CERCLA liability. See EPA's Responsiveness Summary, pp. 17-18, attached to United States' Motion, Exhibit 1.

**Comment No. 7:** New England Container and Emhart object to the Consent Decrees because they contain a covenant not to sue the Settling Parties for natural resource damages at the Site, notwithstanding the Settling Parties' potential liability for natural resource damages under CERCLA § 107(a)(4)(C), 42 U.S.C. § 9607(a)(4)(C). See NEC Comment at 2, 7-8; Emhart Comment at 4. Emhart also notes that the Natural Resource Damage Trustees have not yet performed an assessment of natural resource damages. See Emhart Comment at 4.

**EPA's Response to Comment No. 7:** The covenants not to sue are authorized by Section 122(j)(2) of CERCLA, 42 U.S.C. § 9622(j)(2), which authorizes the federal natural resource trustees to agree to provide a covenant not to sue to a settling PRP for damage to natural resources, where the PRP agrees to take "appropriate" action to protect and restore the damaged natural resources. The proposed Consent Decrees contain such a covenant (at paragraph 18), authorized by the Department of the Interior and the National Oceanic and Atmospheric Administration, the federal natural resource trustees in this case. The proceeds to be paid to the United States under the proposed Consent Decrees include a payment of $136,900 ($68,450 each

from Centerdale Manor and Brook Village) to be dedicated to past and future natural resource damage assessment and/or remediation, which the United States has determined is an "appropriate" payment to seek from these Settling Parties.

Although Emhart is correct that the damage to natural resources has not been comprehensively assessed, the trustees may nonetheless determine that it is "appropriate" to accept a cash-out payment from a PRP. Cf. Davis, 261 F.3d at 24 ("data on the total extent of harm and the respective liabilities of various PRPs are often unavailable. Such difficulties will not preclude a court from entering a consent decree.") (citations omitted). Without such authority, settlements based on a PRP's ability to pay or status as a peripheral party would often have to be postponed, thereby frustrating the purpose of such settlements, which is to advance the public interest and to "reduce . . . transaction costs" borne by parties whose cleanup contribution is likely to be small and at least partially unrelated to total cleanup costs. See Peripheral Party Guidance at 8; see also Cannons, 899 F.2d at 88 ("the need to encourage (and suitably reward) early, cost-effective settlements, and to account inter alia for anticipated savings in transaction costs inuring from celeritous settlement, can affect" the evaluation of the substantive fairness of a settlement) (citations omitted). Here, the approach sought by the Commenters would foreclose a settlement that promises to generate a larger contribution than would likely be available if these PRPs attempted to fund a cleanup from annual excess cash flow. Because these settlements are already based on the Settling Parties' maximum ability to pay, obtaining more detailed information about the damaged natural resources would not result in a change to the settlement terms. For these reasons, the settlement of the Settling Parties' liability for natural resource damages is appropriate and not premature. See EPA's Responsiveness Summary, pp. 18-19,

attached to United States' Motion, Exhibit 1.

**Comment No. 8:** Emhart and New England Container argue that Rhode Island Housing should not receive a covenant not to sue under CERCLA and RCRA, and should not be given contribution protection, because it has not given any consideration in return. See NEC Comment at 3, 8; Emhart Comment at 6.

**EPA's Response to Comment No. 8:** These comments are misplaced. In order to effectuate this settlement, Rhode Island Housing has agreed to refinance the mortgages it has provided to Brook Village and Centerdale Manor. In addition, Rhode Island Housing has "minimized" the fees and other amounts that are typically taken out of these refinancing transactions to support Rhode Island Housing's operations in order to assist EPA in its cleanup of the property. Ventura Declaration, ¶ 28. The refinancing is essential to the success of the settlement. Moreover, the Commenters do not allege that Rhode Island Housing is or could even be liable under CERCLA or RCRA for cleaning up the Site. Rhode Island Housing has never owned nor operated the Site, and has never arranged for the disposal or transportation of hazardous substances or contaminants at or to the Site. Furthermore, CERCLA contains an express exemption for lenders that do not participate in the management of a facility. Section 101(20)(E), 42 U.S.C. § 9601(20)(E). See EPA's Responsiveness Summary, p. 20, attached to United States' Motion, Exhibit 1.

**Comment No. 9:** Emhart and New England Container object to the settlement because it reduces the number of PRPs and encourages other PRPs to seek their own settlements, thereby reducing the chances for a successful cleanup. See NEC Comment at 3, 9; Emhart Comment at 6.

**EPA's Response to Comment No. 9:** Finalizing this settlement represents the best opportunity to maximize the contributions to be made by Brook Village and Centerdale Manor. EPA is also extracting the maximum equity from these properties. While it is true that the settlements eliminate two PRPs, the Settling Parties have already contributed significantly to the cleanup. Most importantly, the Settling Parties are paying the maximum amount they are able and the proceeds generated from this settlement will be placed into an account dedicated for use at this Site.

There are still approximately ten financially viable PRPs remaining at the Site. In addition, the remaining PRPs all have a different status than Brook Village and Centerdale Manor. The remaining PRPs include the successor to the chemical company that operated at the Site; the barrel refurbisher that operated at the Site; and parties whose barrels containing hazardous substances were brought to the Site. Brook Village and Centerdale Manor have a unique status because they came to the Site after industrial operations had ceased and after the initial disposals had taken place and because they are providers of low-income subsidized housing.

Moreover, the refinancing contemplated under the proposed Consent Decrees converts forty years worth of the Settling Parties' cash flow into a single payment and requires them to contribute essentially all their equity to the cleanup, an amount which is greater than the Settling Parties could have contributed in the absence of a settlement. Thus, the proposed Consent Decrees actually help improve the chances of a successful cleanup. See EPA's Responsiveness Summary, pp. 20-21.

**Comment No. 10:** New England Container objects to the Consent Decrees because they

do not include a "reopener" allowing the government to reopen the agreement under Section 122(f)(6)(A), 42 U.S.C. § 9622(f)(6)(A), to recover additional costs from the Settling Parties based on unknown conditions. See NEC Comment at 3, 8.

**EPA's Response to Comment No. 10:** The United States is not required to include these openers in settlements under circumstances present here. CERCLA Subsections 122(a)-(f) prescribe special conditions governing any "agreement under [that] section with any potentially responsible party with respect to remedial action under [CERCLA Section 106]." 42 U.S.C. § 9622(d)(1) (emphasis added). Among other things, Subsection 122(f) prescribes conditions for granting a covenant not to sue for future liability to the United States as part of a "remedial action" settlement. Id. at § 9622(f). As indicated by the statutory language and the relevant case law, the conditions outlined by Subsections 122(a)-(f) apply only to settlements that involve the performance of "remedial action" under Section 106, and do not apply to other types of CERCLA settlements, such as the type of settlement in this case, a cost recovery cash-out settlement under CERCLA Section 107. Such cash-out settlements are entered into pursuant to the authority of the Attorney General to conduct litigation.[27] Further, even if Section 122(f) applied here, under Section 122(f)(6)(B) of CERCLA, EPA is authorized to omit reopeners from its settlements based on its assessment of "ability to pay, litigative risks, [and] public interest considerations," among other factors. As discussed above, these settlements are based on exactly those factors. See EPA's Responsiveness Summary, p. 21, attached to United States' Motion, Exhibit 1

---

[27] See Hercules, 961 F.2d at 799-800 ("because CERCLA § 122(a)-(f) inclusive do not apply to a cost recovery settlement, those provisions cannot be said to contain any clear and unambiguous limitation on the Attorney General's plenary ability to enter into settlements of cost recovery litigation").

B. Other Comment (B. Sachau)

**Comment No. 11:** B. Sachau's comment says that the calculation of cleanup costs is "much too low" and that payments in the proposed Consent Decrees "should be increased by a minimum of one hundred percent."

**EPA's Response to Comment No. 11:** As discussed above, the proposed Consent Decree payments are based on the Settling Parties' ability to pay and their status as peripheral parties. EPA retained an expert, Joan Meyer, to analyze the ability of Brook Village and Centerdale Manor to contribute to cleanup costs. EPA's expert also reviewed the refinancing transactions to insure that they will generate the maximum equity to be put toward cleanup costs. Based on the conclusions of EPA's expert, the settlement payments to be made pursuant to the proposed Consent Decrees are appropriate under the circumstances. See EPA's Responsiveness Summary, p. 22, attached to United States' Motion, Exhibit 1.

C. Endorsement of the Consent Decree

**Comment No. 12:** The United States received a comment from Senator Lincoln Chafee and Congressmen Patrick Kennedy and James Langevin endorsing the proposed Consent Decrees. Their comment describes a shortage of low-income housing in Rhode Island, and commends the Consent Decrees for maintaining low-income housing at the Site while helping to clean up the contamination at the Site.

**EPA's Response to Comment No. 12:** The United States is moving for entry of the proposed Consent Decrees based on its conclusion that the proposed Decrees are fair, reasonable, consistent with the objectives of CERCLA and RCRA, and in the public interest. Accordingly, the United States agrees with the comment endorsing the Decrees. See EPA's Responsiveness

Summary, p. 22, attached to United States' Motion, Exhibit 1.

D. Comment Received During State's Public Comment Period

**Comment No. 13**: The State of Rhode Island likewise held a public comment period for the proposed Consent Decrees. The State received one comment during that period from the Woonasquatucket River Watershed Council ("Council"). Although EPA is not required to respond to the Council's comment because it was not sent to EPA, it will do so with respect to the relevant part of the Council's comment. The Council asserts that the proposed Consent Decrees should include requirements obligating Brook Village and Centerdale Manor to keep their residents apprised of the status of the contamination and cleanup and the permitted or prohibited uses of the Site property. See Council's Comment at 2.

**EPA's Response to Comment No. 13:** Requirements of the type suggested by the Council are not relevant to these proposed Consent Decrees. Rather, requirements concerning restrictions on activities and notice to residents will be set out in the final cleanup plan (i.e., the Record of Decision for the Site) that EPA expects to issue in 2007. In the interim, EPA and the Rhode Island Department of Environmental Management ("RIDEM") hold monthly meetings at North Providence Town Hall to keep the town, local officials and the public informed of Site proceedings. EPA also issues periodic site updates and press releases on all planned and completed actions. To insure that this information gets to the residents of the buildings, EPA and RIDEM also organize meetings with the residents when project developments occur within the vicinity of the buildings. See EPA's Responsiveness Summary, p. 23, attached to United States' Motion, Exhibit 1.

E. Comment Received After the Close of the Public Comment Period

**Comment No. 14**: More than three months after the close of the public comment period, Emhart submitted an additional comment which further objected to the proposed Consent Decrees because of a change in the status of New England Container's parent corporation and a change in the financial status of New England Container. Specifically, Emhart learned that New England Container's parent corporation filed for bankruptcy, and New England Container sold substantially all of its assets to a third party. See Emhart's Second Comment at 1-2.

**EPA's Response to Comment No. 14**: Since Emhart submitted this comment, the bankruptcy plan for New England Container's parent corporation was confirmed by the United States Bankruptcy Court for the District of Delaware. In addition, the claims filed by Emhart, on its own behalf and as a surrogate for EPA (without EPA's consent), were estimated at zero by the Delaware Bankruptcy Court and essentially dismissed. New England Container was not a debtor in the bankruptcy.

EPA has also learned that New England Container recently sold substantially all of its assets and is no longer an operating entity. However, EPA has been told that New England Container owns assets in the form of the proceeds of the sale of its assets. Notwithstanding these developments, the proposed settlements are based on the limited ability of Brook Village and Centerdale Manor to contribute to cleanup costs. The financial condition of the other PRPs does not change EPA's conclusion that these settlements represent the most that the Settling Parties are able to pay and an opportunity to maximize the contributions to be made by Brook Village and Centerdale Manor. See EPA's Responsiveness Summary, p. 24, attached to United States' Motion, Exhibit 1.

* * * * * * * * * * * * * *

The United States submits that comments on the Consent Decrees provide no basis for withdrawal of the proposed settlement and that the settlements are fair, reasonable and in the public interest and should be approved by this Court.

CONCLUSION

For the forgoing reasons, the United States respectfully requests that this Court approve, sign and enter the proposed Consent Decrees.

Respectfully Submitted,

SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environmental and Natural Resources
Division
U.S. Department of Justice
Washington, D.C. 20530

HENRY S. FRIEDMAN
Senior Attorney
Environmental Enforcement Section
Environmental and Natural Resources
Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611

ROBERT CLARK CORRENTE
United States Attorney

By: ______________________
LUIS MATOS (R.I. Bar No. 4475)
Assistant United States Attorney
District of Rhode Island
Fleet Center, 50 Kennedy Plaza, 8th Floor,
Providence, Rhode Island 02903
(401) 709-5000

OF COUNSEL:

EVE VAUDO
Enforcement Counsel
U.S. Environmental Protection Agency
New England Region
One Congress St., Suite 1100
Boston, Ma. 02114-2023

CERTIFICATE OF SERVICE

I, Henry S. Friedman, hereby certify that copies of the United States of America's Motion to Enter Consent Decrees, together with the exhibits attached thereto, and Memorandum in Support thereof were served on February 7, 2006 by first class mail, postage prepaid, and by electronic mail, as follows:

Laurie Burt, Esq.
Foley Hoag
Seaport World Trade Center
155 Seaport Blvd.
Boston, Ma. 02210-2600
lburt@foleyhoag.com

Richard J. Welch
Moses & Afonso
170 Westminster Street, Suite 201
Providence, R.I. 02903
rwelch@mosesafonso.com

William S. Eggeling
Ropes & Gray LLP
30 Kennedy Plaza
Providence, R.I. 02903
William.Eggeling@ropesgray.com

Howard J. Castleman, Esq.
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111
Hcastleman@brownrudnick.com

Michael Milito, Esq.
Rhode Island Housing and Mortgage Finance Corporation
44 Washington St.
Providence, RI. 02903
mmilito@rihousing.com

Brian Wagner, Esq.
Rhode Island Department of Environmental Management
235 Promenade Street
Providence, RI. 02908-5767
brian.wagner@dem.ri.gov

Terrence Tierney
Assistant Attorney General
R.I. Department of the Attorney General
150 North Main St.
Providence, R.I. 02903
Ttierney@riag.ri.gov

Jerome C. Muys, Jr.
Swidler Berlin
The Washington Harbour
3000 K. Street, N.W., Suite 300
Washington, D.C. 20007-5116
jcmuys@swidlaw.com

James P. Ray
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597
jray@rc.com

HENRY S. FRIEDMAN
Senior Attorney
Environmental Enforcement Section
Environmental and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611